## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| DELTA FAUCET COMPANY,<br><br>            Plaintiff,<br><br>v.<br><br>BEN WATKINS and<br>JOHN DOES 1-10,<br><br>            Defendants. | Case No. 1:23-cv-200<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Delta Faucet Company ("Delta"), an Indiana corporation ("Plaintiff" or "Delta"), brings this action against Defendant Ben Watkins and John Does 1-10 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A); common law trademark infringement and unfair competition; and deception and conversion under the Indiana Crime Victims' Relief Act, and alleges as follows. These claims arise from Defendants' misappropriation of Delta's trademarks in connection with Defendants' unlawful and unauthorized sale of non-genuine products bearing Delta's trademarks on the Internet. In support of its Complaint, Delta alleges as follows:

### PARTIES

1.    Plaintiff is a corporation, organized under the laws of Indiana, with its principal place of business located in Indianapolis, Indiana.

2.      Defendant Ben Watkins is a natural person who, upon information and belief, is a resident of Colorado.

3.      Defendant Watkins operates a third-party storefront on www.amazon.com ("Amazon") that is currently called "Ben Watkins," with a Merchant ID number of A2VUGI7D639PP3 (hereinafter Defendant Watkins shall be referred to as "Watkins").  Watkins's "Ben Watkins" storefront provides an address of 2048 Eliot Street, Denver, Colorado, 80211.  Upon investigation, this is not an accurate address for Watkins, but Watkins can be located via the email address used to operate the "Ben Watkins" storefront, as well as through the Amazon messaging system for the "Ben Watkins" storefront.

4.      The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise, of Defendants John Does 1 through 10 ("Doe Defendants") are unknown to Delta.  Therefore, Delta sues these Defendants by a fictitious name.  Delta is informed and believes, and on that basis alleges, that the Doe Defendants include persons and entities assisting or acting in connection with the actions complained of herein and include persons and entities that are responsible in some manner for the acts, occurrences, and liability hereinafter alleged and referenced.  The Doe Defendants are unknown natural persons and/or corporations/business entities that unlawfully acquired, distributed, or sold products bearing Delta's trademarks.  When the true names, involvement, and capacities of these parties are ascertained, Delta will seek leave to amend this Complaint accordingly.

**JURISDICTION**

5.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Plaintiff's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), and its claims arising under the laws of the State of Indiana

are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Indiana and established sufficient minimum contacts with Indiana by, among other things, advertising and selling infringing products bearing Delta's trademarks to consumers within Indiana through a highly interactive commercial website, through the regular course of business, with the knowledge that Delta is located in Indiana and is harmed in Indiana as a result of Defendants' sales of infringing products to Indiana residents.  Defendants know that Delta is located in Indiana, among other reasons, because they received one or more cease-and-desist letters informing them that Delta is located in Indiana and is harmed in Indiana by their unlawful actions.  Delta's claims arise out of Defendants' sales of infringing products bearing Delta's trademarks to Indiana residents through the regular course of business.

7.      Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

## VENUE

8.      Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Delta & Its Trademarks

9.      Delta markets and sells high quality kitchen, bar, beverage, bathroom, and tub faucets; pot fillers; sink and counter accessories; showerheads; bathing products; towel bars and similar accessories, including products under the Delta® brand name ("Delta Products").

10.      Founded in 1954, Delta is known as "America's Faucet Innovation Leader."

3

11.    The Delta® brand goes beyond excellent design to incorporate smart thinking that anticipates consumers' needs, providing thoughtful innovations and inspirational designs that delight. From Touch2O® Technology that turns faucets on and off with just a tap, to a DIAMOND™ valve that helps the faucet last up to 5 million uses, Delta faucets provide a better way to experience water.

12.    As a company that delivers water every day to residential and commercial buildings, Delta places a high priority on products that address today's environmental concerns, such as water conservation and water quality.

13.    To that end, Delta invests in internal processes and systems that provide innovative solutions and ensure exceptional customer satisfaction.

14.    Delta allows its products to be purchased by end-user consumers in the United States only from Delta itself or from sellers who are expressly authorized by Delta to sell Delta Products ("Authorized Sellers").

15.    Delta permits Authorized Sellers to sell Delta Products in approved channels only and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Delta Rules").

16.    Delta devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Delta Products only from Delta itself or from Authorized Sellers who are required to follow the quality controls and other requirements in the Delta Rules, Delta ensures that consumers receive products that are subject to its quality controls and maintain the integrity and reputation of the Delta brands.  In the highly competitive kitchen, bathroom, and home improvement market,

quality and customer service are a fundamental part of a consumer's decision to purchase a product.

17.     To promote and protect the Delta brands, Delta has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: DELTA® (Reg. No. 5,273,845); DELTA® (Reg. No. 2,583,761); DELTA® (Reg. No. 3,062,101); DELTA® (Reg. No. 2,586,604); DELTA® (Reg. No. 4,518,067)); DELTA® (Reg. No. 0,668,880); and DELTA® (Reg. No. 4,638,296) (collectively, the "Delta Trademarks").

18.     The registration for each of the Delta Trademarks is valid, subsisting, and in full force and effect.

19.     Delta actively uses, advertises, and markets the Delta Trademarks in commerce.

20.     Consumers recognize the Delta Trademarks as being associated with high-quality kitchen, bathroom, and home improvement market products.

21.     Due to the quality and exclusive distribution of Delta's products, and because Delta is recognized as the source of high-quality products, the Delta Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to Delta Product Quality**

22.     E-commerce retail sales have exploded over the past decade.  From 2009 through the third quarter of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.8%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (November 18, 2022), https://fred.stlouisfed.org/series/ECOMPCTSA.

23.     In 2021, consumers spent $870 billion on e-commerce sales, a 14% increase from 2020.  The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2021, United States consumers spent more than $378 billion in e-commerce sales

on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021. *See* Jessica Young, *U.S. ecommerce grows 14.2% in 2021*, Digital Commerce 360 (February 18, 2022), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

24.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality of its products.

25.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

26.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

27.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers. It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE

WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

28.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

29.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate

Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

30.    In January 2020, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id.* at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

31.    In its 2018, 2019, 2020, and 2021 annual reports to its shareholders, Amazon acknowledged that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the products that are described to consumers.  *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2022), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

32.   Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, a brand owner's products are used to supply drinking water.

33.   The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

34.   When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

35.   For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

36.   When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

37.    Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

38.    Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

39.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.    Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

40.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a

particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

41.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

**Delta Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

42.    Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing.  These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

43.    Delta has been a victim of the issues caused by unauthorized sellers on online marketplaces.  Numerous consumers who purchased Delta Products from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, defective, previously used, or inauthentic.

44.    For example, on March 31, 2022, an anonymous Amazon user complained of receiving a faucet that was used, writing that the product "came with missing parts and obviously opened packages."  The seller also described receiving a box that had writing that stated "something like 'thanks for giving me a second chance.'"

Amazon Customer

⭐☆☆☆☆ **Totally defective. It even looks like it was returned previously, then resold to me!**
Reviewed in the United States on March 31, 2022
Color: Matte Black | Size: Swivel Spout | Style: Standard Handle | **Verified Purchase**
What out for items that say something like "thanks for giving me a second chance" on the box. Both Delta robe hooks came with missing parts and obviously opened packages. Rather than sending them back I just bought pieces to make them work due to the timing.

45.    On January 7, 2022, Amazon user "Ally" complained of receiving a faucet that was "full of dirty fingerprints" that was also missing parts.



46.    On April 6, 2022, Amazon user "therabbithole" complained of receiving a faucet that was missing several parts and bore a sticker that indicated it was a used product: "THANKS TO YOU, THIS PRODUCT HAS A SECOND LIFE."







47.    On February 26, 2022, Amazon user "Megan Stewart" complained of receiving a used, scratched, and discolored item.

 Megan Stewart

★☆☆☆☆ **Received a used, scratched, and discolored item**
Reviewed in the United States on February 26, 2022
Color: Arctic Stainless | Size: Without Soap Dispenser | Style: Touch2O | Verified Purchase

Very frustrated. Waiting a week for this item to arrive. Only to put it into the sink and realize it's scratched and discolored. Now, the hassle of returning



48.     On November 10, 2022, Amazon user "Jannine" complained of receiving a previously used faucet that was also defective.  The customer wrote that "the REALLY shocking item in the box was a letter, written on an 8-1/2 X 11 piece of paper, by an individual who described himself as a professional plumber.  In it, he related his efforts trying to install it but that he could not get the cold water valve to work.  He specifically said not to try installing it because it is defective."

 Jannine

★☆☆☆☆ **Very Disappointed! Received. Previously Returned and Defective Faucet!**
Reviewed in the United States on November 10, 2022
Color: Matte Black | Size: Without Soap Dispenser | Style: Standard | Verified Purchase

If I could give this a negative number of stars I would. Opened the box and the faucet had obviously been unwrapped before, but the REALLY shocking item in the box was a letter, written on an 8-1/2 X 11 piece of paper, by an individual who described himself as a professional plumber. In it, he related his efforts trying to install it but that he could not get the cold water valve to work. He specifically said not to try installing it because it is defective.

THAT is the valve that was sent. Probably just a careless mistake, but I can't recommend it.

49.     On November 12, 2022, Amazon user "Armando" complained of receiving a faucet that was missing several parts, writing that although the faucet itself was a good product, the two missing parts were the reason they left a negative review, also writing that their "client is not happy" with the delay caused by the missing parts.

 Armando

★☆☆☆☆ **missing parts**
Reviewed in the United States on November 12, 2022
Color: Chrome | Size: 1.2 GPM Water Flow | Style: Faucet | Verified Purchase

missing 2 parts , I ordered one to cover the 3 holes but now again missing the pin to pull and push to close the drain ... I can't install it like that.. my client is not happy with me .waiting for me to order parts and again one more part is missing. the faucet is nice ,5 stars



50.    On February 4, 2021, Amazon customer "Vilia Jakaitis" complained about receiving a product missing a critical component: "Missing a part! One small nut but critical! Not impressed so far …. Argh!"    The customer asked, "Where's the quality control?" "



51.    On November 14, 2019, Amazon user "Stephanie Miller" complained of receiving a faucet that leaked and broke after installation.    The customer also questioned the product's authenticity, writing, "I don't even believe this was a delta set.    It doesn't say delta anywhere on it."





52.    On May 30, 2019, Amazon user "DLS" described receiving a used product in damaged packaging: "This isn't new. It was clearly repacked and the faucet head is scratched."

14

 **DLS**

⭐☆☆☆☆  **Damaged already-used product in damaged box!**

Reviewed in the United States on May 30, 2019

Color: Polished Nickel    |    Verified Purchase

This isn't new. It was clearly repacked and the faucet head is scratched.

53.     On March 14, 2019, Amazon user "Donna F." reported receiving a damaged item and compromised packaging: "It came with a big scratch on the temperature valve handle. The box looked like it was opened and we received someone else's return."

 **Donna F.**

⭐☆☆☆☆  **Damaged**

Reviewed in the United States on March 14, 2019

Color: Stainless  |  Style: Single Handle  |  Verified Purchase

It came with a big scratch on the temperature valve handle. The box looked like it was opened and we received someone else's return



| Helpful |    ˅ 1 comment    |    Report abuse

54.     On February 5, 2018, Amazon user "Wes F." reported receiving an item that appeared to be structurally different and packaged incorrectly: "Item received was manufactured differently, incorrectly packaged, or fraudulent. This product is supposed to be 7" wide which is standard. Verified on multiple websites. Item received was 6.5"."

 Wes F.

⭐☆☆☆☆ **Not Delta T13020**

Reviewed in the United States on February 5, 2018

Color: Stainless | Style: Handle

Item received was manufactured differently, incorrectly packaged, or fraudulent. This product is supposed to be 7" wide which is standard. Verified on multiple websites. Item received was 6.5".

One person found this helpful

[ Helpful ]  |  ∨ Comment  |  Report abuse

55.    The foregoing reviews are only a small sample of the negative reviews of Delta Products that have been posted on the Amazon platform.

56.    Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review. Given that Defendants are selling a high volume of products bearing the Delta Trademarks on Amazon and are not subject to Delta's quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of Delta Products that appear on the Amazon website—were written by customers who purchased products bearing the Delta Trademarks from Defendants.

**Delta Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented By Online Marketplaces, Protect the Value of the Delta Trademarks, and Ensure Customers Receive the Genuine, High Quality Products They Expect from Delta**

57.    The above reviews show how sales of poor-quality Delta Products disappoint Delta's consumers and cause significant harm to the reputation and goodwill of Delta and its brand. To protect itself and consumers from these harms, Delta implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

58.    Delta's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Delta

Trademarks by unauthorized sellers like Defendants who do not abide by Delta's quality controls. The goal of Delta's quality control program is to ensure that consumers who buy Delta Products, including ones buying online, receive the high-quality products and services that they expect with the Delta name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill of the Delta brand.

59.    Delta abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

60.    Delta's ability to exercise its quality controls is essential to the integrity and quality of Delta Products, as well as the value of the Delta Trademarks and other intellectual property.

61.    Delta's quality controls begin with requiring that all outside sales of its products take place through Authorized Sellers.  This basic step ensures that everyone who is selling Delta Products is ultimately subject to Delta's quality control requirements.

62.    The Delta Rules limit to whom and where Authorized Sellers may sell Delta Products.  To prevent persons outside of Delta's quality controls from acquiring and reselling Delta Products, the Delta Rules prohibit Authorized Sellers from selling Delta Products to any third party that intends to resell the products and that is not an Authorized Seller.  Authorized Sellers are permitted to sell Delta Products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

63.    Authorized Sellers are also prohibited from selling Delta Products on any website they do not themselves own and operate unless they first obtain consent from Delta.

64.    These restrictions are essential to Delta's ability to exercise its quality controls over Delta Products because they prevent unauthorized sellers from obtaining and reselling Delta Products and allow Delta to know where all of its products are being sold online by Authorized

Sellers. If a quality issue arises through an online sale, Delta can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Delta is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

65. In addition to restricting where and how Authorized Sellers can sell Delta Products, the Delta Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Delta Products.

66. To ensure that customers receive the genuine and high-quality products they expect from Delta, the Delta Rules require Authorized Sellers to inspect all Delta Products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory. Authorized Sellers are prohibited from selling damaged or defective products. Further, to assist Delta in identifying any product quality issues, Authorized Sellers are required to report any defects to Delta.

67. The Delta Rules also require that Authorized Sellers store Delta Products in accordance with guidelines issued by Delta. This requirement helps ensure that Delta Products are stored properly and are not damaged prior to being shipped to the consumer.

68. To avoid consumer confusion and ensure that customers receive genuine Delta Products, Authorized Sellers must sell Delta Products in their original packaging and are prohibited from relabeling, repackaging, or altering Delta Products or any accompanying label, literature, or safety-related information, unless instructed by Delta.

69. Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Delta Products, including any serial number, UPC code, or other identifying information.

70.    The Delta Rules give Delta the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Delta Products, to ensure their compliance with Delta's quality control requirements.  Authorized Sellers also must cooperate with Delta with respect to any product recall or other consumer safety information dissemination effort conducted by Delta regarding Delta Products.

71.    The Delta Rules also require Authorized Sellers to provide various customer services to their customers.

72.    For example, Authorized Sellers must familiarize themselves with the features of all Delta Products kept in their inventory so that they can advise customers on the selection and safe use of Delta Products.  Following the sale of genuine Delta Products, Authorized Sellers must provide ongoing support to consumers and provide prompt replies to their inquiries.

73.    Delta's quality control and customer service requirements are legitimate and substantial and have been implemented so that Delta can control the quality of goods manufactured and sold under the Delta Trademarks in order to protect consumers and preserve the value and goodwill associated with the Delta Trademarks.

74.    Delta's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Delta product that they were considering buying was being sold by an Authorized Seller who is subject to Delta's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Delta's quality controls and over whom Delta is unable to exercise its quality controls.

**Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Delta Imposes Additional Requirements on Its Authorized Sellers Who Sell Online**

75.     As shown in consumer reviews cited above, Delta Products sold online are more susceptible to quality and authenticity problems as consumers cannot see the product before they buy it.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

76.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Delta imposes additional quality control requirements on all of its Authorized Sellers who sell Delta Products online.

77.     The Delta Rules allow Authorized Sellers to sell Delta Products only through "Permissible Websites" and "Authorized Websites."  These rules allow Delta to oversee all Authorized Sellers who sell Delta Products online.

78.     A "Permissible Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; and (2) lists the Authorized Seller's mailing address, telephone number, and email address.  Permissible Websites do not include storefronts on any online marketplace.

79.     Authorized Sellers must receive prior written approval from Delta before they can sell Delta Products on any other website.  To obtain this approval, Authorized Sellers must submit applications and undergo substantial vetting by Delta that includes review of an applicant's business operating record and online review history.  A website that Delta permits an Authorized Seller to use through this process is called an "Authorized Website."

80.    The Delta Rules impose numerous additional requirements on Authorized Sellers who sell Delta Products on Permissible Websites or Authorized Websites (collectively, "Authorized Online Sellers").

81.    For example, Authorized Online Sellers must use images of Delta Products provided or approved by Delta and keep product descriptions up to date. Authorized Online Sellers are also prohibited from advertising any Delta product they do not carry in inventory.

82.    The Delta Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Delta or another third party. These requirements allow consumers of Delta Products to understand the nature of the seller from whom they are purchasing and contact the seller if any quality issues arise. These requirements also allow Delta to protect the public from the sale of poor quality and counterfeit Delta Products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

83.    At Delta's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Website, or Authorized Website, where Authorized Online Resellers are selling Delta Products.

84.    Authorized Online Sellers are prohibited from representing or advertising any Delta product as "new" that has been returned, repackaged, or otherwise been altered by a customer. When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new." The Delta Rules prohibit Authorized Online Sellers from allowing or carrying out this practice to

ensure that customers receive the high-quality Delta Products they expect when they purchase "new" products.

85.    Unless otherwise approved by Delta, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Delta Products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive Delta Products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller offers that meet Delta's quality standards will be the same products that are actually shipped to the customer in fulfillment of an order, rather than other products that are outside of Delta's quality controls.

86.    All websites through which Authorized Online Sellers sell Delta Products must comply with all applicable data security, accessibility, and privacy requirements.

87.    All websites where Authorized Online Sellers sell Delta Products must have a mechanism for receiving customer feedback, and Authorized Online sellers must take appropriate steps to address any feedback received.  Authorized Online sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online sellers' products and their responses; (ii) provide this information to Delta upon request; and (iii) cooperate with Delta in investigating negative online reviews related to sales of Delta Products.

88.    The additional quality control requirements that Delta imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Delta to carefully control the quality of Delta Products that are sold online and quickly address any quality issues that arise.

89.     Delta's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Delta Products online receive genuine, high-quality Delta Products that abide by Delta's quality controls.  Consumers purchasing Delta Products online would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Delta's quality controls.

### Delta Monitors and Audits Its Authorized Online Sellers to Ensure They Comply with Its Quality Control Requirements

90.     Delta regularly audits its Authorized Online Sellers and monitors Authorized Websites and Permissible Websites to ensure that Authorized Online Sellers are adhering to Delta's quality control requirements.  Delta carries out its auditing and monitoring actions pursuant to an internal program called the Delta Online Quality Control Program ("Auditing Program").

91.     As part of its Auditing Program, Delta examines Authorized Websites and Permissible Websites to ensure that the Authorized Online Sellers who sell through the websites are complying with the Delta Rules.  During these examinations, Delta checks to make sure that, among other requirements, Authorized Websites and Permissible Websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Delta or a third party; (iii) do not display any content that could be detrimental to the Delta family of brands; (iv) do not make any representations regarding Delta Products that are misleading; (v) exclusively contain images of Delta Products and product descriptions that are supplied or authorized by Delta and are up-to-date; and (vi) have a mechanism through which customers can provide feedback.

92.     Delta also periodically inspects online reviews of Delta Products and Authorized Online Sellers that appear on Authorized Websites and Permissible Websites.  If Delta discovers

reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Delta Products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Delta communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

93. Delta also conducts a test purchase of a Delta product from a rotating sample of Authorized Websites and Permissible Websites. If Delta discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites and Permissible Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Delta communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

94. Through its Auditing Program, Delta may visit the facilities of its Authorized Online Sellers to confirm that all of its quality control requirements are being followed and that Authorized Online Sellers are not selling any counterfeit Delta Products.

95. If Delta discovers that an Authorized Online Seller is selling Delta Products of poor quality or otherwise not adhering to Delta's quality control or customer service requirements, Delta conducts an investigation to determine the source of the problem. The Delta Rules require that Authorized Online Sellers cooperate with Delta's investigation, permit Delta to inspect their facilities and records relating to Delta Products, and disclose all information about where they obtained Delta Products. Based on what its investigation reveals, Delta has the right to cease

selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Delta Products.

**Genuine Delta Products Come with Delta's Limited Warranty;**
**Defendants' Products Do Not**

96.    Delta Products purchased from Delta or Delta's Authorized Sellers come with the Delta Limited Warranty (the "Delta Warranty").

97.    The Delta Warranty provides that Delta can repair or replace during the applicable warranty period any part or finish that proves defective in material and/or workmanship under normal installation, use and service. If repair or replacement is not practical, Delta may elect to refund the purchase price in exchange for the return of the product. The complete Delta Warranty statement can be viewed on the Delta website—see https://www.deltafaucet.com/service-parts/warranty—and is incorporated herein.

98.    As discussed above, Delta cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to Delta's quality controls.  For this reason, the Delta Warranty does not cover Delta Products sold by unauthorized sellers, like Defendants, who do not comply with Delta's quality controls and standards.  Indeed, the Delta Warranty specifically states: "Because Delta Faucet Company is unable to control the quality of Delta Products sold by unauthorized sellers, unless otherwise prohibited by law, this warranty does not cover Delta Products purchased from unauthorized sellers."

99.    The Delta Warranty is a material component of genuine Delta Products.  Consumers who purchase Delta Products with the Delta Warranty receive the peace of mind that they are

receiving a good quality product, that Delta stands behind the product, and that if a defect occurs, they will have the ability to have the product repaired or replaced.

100.   Consumers would find it material and relevant to their purchasing decision to know whether a Delta product they were considering buying was covered by the Delta Warranty.  If a consumer knew a product did not come with the Delta Warranty, the consumer would be less likely to purchase the product.

**Defendants Are Not Authorized Sellers, Are Illegally Selling Non-Genuine Products Bearing the Delta Trademarks, and Have Provided Falsified Contact Information to the Public to Avoid Detection**

101.   Due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the Delta Trademarks by unauthorized Internet sellers, Delta actively monitors the sale of its products online.

102.   In the course of this monitoring, Delta discovered numerous products bearing the Delta Trademarks being illegally sold by Defendants on Amazon through the "Ben Watkins" storefront.

103.   After Delta discovered products bearing the Delta Trademarks being illegally sold on the Amazon storefront, Delta investigated the storefront to determine who was operating the storefront.

104.   Because Defendants have not disclosed a valid or reliable business address or contact information on their storefront,[1] Delta had to spend significant time and money

---

[1] On September 1, 2020, Amazon changed its policy regarding anonymous sales in an effort to curb sales of dangerous and counterfeit items. *See* Jay Greene, *Amazon will disclose merchant names to discourage rogue sales*, WASH. POST (July 8, 2020) https://www.washingtonpost.com/technology/2020/07/08/amazon-will-disclose-merchant-names-discourage-rogue-sales/. Since then, Defendants recently have published on their "Ben Watkins" storefront a business address of 1459 Belle Meade Dr., Copley, Ohio 44321. Delta sent cease-and-desist letters to this address in February and March of 2022, but both were returned as undeliverable.  Defendants later published on their "Ben Watkins" storefront a business address of 2048 Eliot St., Denver, Colorado, 80211, but this letter was also returned as undeliverable.

investigating the storefront to attempt to identify the real identity of the business and people operating it.

105.    After conducting an investigation, Delta identified Watkins as the owner and operator of the "Ben Watkins" storefront.

106.    On or about February 24, 2022, Delta sent Defendants a cease-and-desist letter to Defendants at the business address then-listed on their "Ben Watkins" storefront: 1459 Belle Meade Dr., Copley, Ohio, 44321 ("Copley Address") listed on the "Ben Watkins" storefront at the time. The letter was returned to Delta as undeliverable, with the carrier stating "no such person ever at this address."

107.    On or about March 9, 2022, Delta caused a letter to be sent to Defendants concerning Defendants' intellectual property infringement through Amazon's messaging system.

108.    This letter warned Defendants that they were violating Delta's intellectual property rights, and that the infringement would be reported to Amazon if Defendants did not immediately and permanently remove all products bearing the Delta Trademarks from the "Ben Watkins" storefront.

109.    Defendants did not respond to this letter and continued to sell products bearing the Delta Trademarks on the "Ben Watkins" storefront.

110.    On or about March 10, 2022, Delta attempted sending another cease-and-desist letter to Defendants at the Copley Address listed on their "Ben Watkins" storefront. The letter was again returned as undeliverable.

111.    Thus, it appears that Defendants used the Copley Address to facially comply with Amazon's 2020 rule requiring public disclosure of storefront contact information, while hiding their true contact information from Delta and anyone else seeking to reach them.

112.    Unable to reach Defendants at the address disclosed on their storefront and through the platform's communication system, Delta subpoenaed Amazon for information related to the "Ben Watkins" storefront. Amazon disclosed that the account is maintained in the name of Watkins and that the contact address used by Watkins to maintain his Amazon account is 17 Heritage Oak Way, Simpsonville, South Carolina, 29681 ("Simpsonville Address").  Amazon also disclosed that the contact email address used to maintain the Amazon account is benwatkinsao391@gmail.com. On or about July 27, 2022, Delta sent a cease-and-desist letter to Defendants at the Simpsonville Address. Delta also sent a digital copy of this letter via email to Defendants at the benwatkinsao391@gmail.com email address.

113.    This letter informed Defendants that their unlawful sale of products bearing the Delta Trademarks constituted trademark infringement and tortious interference, and demanded that Defendants permanently cease and desist selling all products bearing the Delta Trademarks.

114.    Defendants did not respond to this cease-and-desist letter and continued to sell products bearing the Delta Trademarks on the "Ben Watkins" storefront.

115.    On or about September 8, 2022, counsel for Delta sent another cease-and-desist letter to Defendants at the Simpsonville Address informing Defendants that they must immediately and permanently cease and desist selling all products bearing the Delta Trademarks and identify their sources of such products to avoid legal action.

116.    Defendants did not respond to Delta's cease-and-desist letter and continued to sell products bearing the Delta Trademarks on the "Ben Watkins" storefront.

117.    On or about September 29, 2022, counsel for Delta sent a preservation letter to Defendants at the Simpsonville Address, reminding Defendants of their obligation to preserve all

records and information relating to their sale of products bearing the Delta Trademarks given the reasonably anticipated litigation before them.

118.    Defendants did not respond to Delta's preservation letter and continued to sell products bearing the Delta Trademarks on the "Ben Watkins" storefront.

119.    On or about December 1, 2022, counsel for Delta sent a draft of this Complaint to the Defendants at the Simpsonville Address and the benwatkinsao391@gmail.com email address, warning them that Delta was prepared to file a lawsuit against them if they continued to list Delta products on the "Ben Watkins" storefront. The draft complaint notified Defendants that Delta was located in Indiana and that Defendants' were injuring Delta in Indiana through their illegal actions and would be subject to personal jurisdiction in Indiana if they continued to engage in their conduct.

120.    Defendants again did not respond and continued to sell products bearing the Delta Trademarks on the "Ben Watkins" storefront.

121.    Subsequently, Delta discovered another address in Greenville, South Carolina, for an individual previously connected to the Simpsonville Address sharing Watkins's first name. Delta delivered the draft complaint to a resident of that address.  Delta successfully contacted the individual formerly residing at the Simpsonville Address, but this individual claimed that he had no knowledge of the "Ben Watkins" storefront, that he did not live at the Simpsonville Address, and that he has no knowledge of either his name or the Simpsonville Address being used to operate any Amazon storefront.  The individual signed a sworn declaration to this effect.

122.    At or about the same time, Delta discovered that the "Ben Watkins" storefront changed its contact address displayed on the storefront page on Amazon to 2048 Eliot Street, Denver, Colorado, 80211 ("Denver Address"). On January 24, 2023, Delta sent another cease-and-

desist letter to Defendants at the Denver Address. On January 25, 2023, and January 26, 2023, FedEx attempted delivery but was not successful.  On January 26, 2023, FedEx confirmed it could not complete delivery because Watkins does not reside at the address. Thus, it appears that Defendants used the Denver Address to facially comply with Amazon's rule requiring public disclosure of storefront contact information, while hiding their true contact information from Delta and anyone else seeking to reach them.

123.    As of the time of filing, Defendants have not responded to any of Delta's letters and continue to advertise and sell products bearing the Delta Trademarks through their "Ben Watkins" Amazon storefront.

124.    Through their highly interactive "Ben Watkins" storefront on Amazon, Defendants have sold products bearing the Delta Trademarks to residents of Indiana through the regular course of business.

125.    Defendants' disregard of Delta's cease-and-desist letters, continued use of false contact information, and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Not Subject To, Do Not Abide By, and Interfere With, Delta's Quality Control Requirements**

126.    Defendants are not Authorized Sellers of Delta Products, and do not abide by Delta's quality control and customer service requirements that Delta requires Authorized Sellers to follow.

127.    Defendants directly violate Delta's quality controls, among many other ways, by failing to completely and accurately identify themselves on their online storefront.  Defendants do not publicly display their email, real physical address, or even any telephone number on their Amazon storefront.

128.    Defendants also do not comply with Delta's quality controls— and interfere with Delta's quality controls—because they have not given Delta the right to audit and inspect Defendants' facilities and practices.  Therefore, among other things, Delta cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) selling products only in official and unaltered Delta packaging; (iv) refusing to allow products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.

129.    Defendants' failure to abide by the Delta Rules prevents Delta from exercising control over the quality of products Defendants sell bearing the Delta Trademarks.  Unlike with its Authorized Online Sellers, Delta cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

130.    Because the products Defendants sell bearing the Delta Trademarks are not subject to, do not abide by, and interfere with Delta's quality control and customer service requirements, they are not genuine Delta Products.

### Defendants Are Selling Defective, Damaged, Previously Used, and Other Poor Quality Products Through Their Amazon Storefront

131.    Consumers on Amazon can leave reviews of sellers as well as products.  Reviews of Defendants' "Ben Watkins" Amazon storefront show that Defendants have sold numerous poor quality products to consumers.  Although Amazon has added comments to some of these complaints stating that Amazon takes "responsibility" for the "fulfillment experiences" described

in the complaints, the problems that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants.

132.    For example, on August 17, 2022, an anonymous Amazon user complained of receiving a product from Defendants that was listed as "new," but had "numerous well defined dings in it."  The customer also complained that the "valves and assembly parts were not in their respective wraps," which led the customer to question whether the product was new or used.

★★☆☆☆    "It is supposed to be new...The face plate had numerous well defined dings in it. Valves and assembly parts were not in their respective wraps- the wraps were in the box, just not on the parts. Why would someone send this as new? The replacement better be brand new "
Read less
By Amazon Customer on June 18, 2022.
Message from Amazon: This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

133.    On August 17, 2022, Amazon user "roman," left a review stating that the product they received from Defendants "came with screws missing" as well as the knob on the overflow. The user wrote: "We paid the plumber for installation but now have incomplete faucet we can't use."

★☆☆☆☆    "We like this faucet and unfortunately it came with the screws missing and the knob on the overflow is missing. We discovered that when the plumber was installing it. We paid the plumber for the installation but now have incomplete faucet we can't use. Please advice. "
Read less
By roman on August 17, 2022.
Message from Amazon: This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

134.    On August 17, 2022, Amazon user "P. Mandel" complained of receiving an unsealed, open package:

★☆☆☆☆    "The box was not protected, not even sealed. It was actually opened! "
By P. Mandel on August 17, 2022.
Message from Amazon: This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

135.    On March 4, 2022, Amazon user "Connie" complained of receiving an open and unsecured product from Defendants, writing that "two of the three items were not in a plastic container," which raised concerns that the customer didn't know "if any vital parts are missing."

★★★☆☆     "The top flap of the box arrived opened and unsecured. Two of the three items were not in a plastic container. Therefore, I don't know if any vital parts are missing. Please advise."
Read less
By Connie on March 4, 2022.

136.    On December 2, 2017, an anonymous Amazon user complained of receiving a product from Defendants that was missing parts.  The user wrote that the "packaging box was badly re-taped" and that the product "appears to have been returned once before and sent out again without inspection."

★☆☆☆☆     "Spout Hub missing. Envelops for small pieces are ripped or do not contain items. Packaging box was badly re-taped. Appears to have been returned once before and sent out without inspection."
Read less
By Amazon Customer on December 2, 2017.

137.    These types of complaints about Defendants are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers.

138.    Although Amazon has added comments to some of these complaints stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the complaints or has otherwise struck through these reviews, the problems that customers address in these reviews— including sales of products that were previously used, old, tampered with, or contained in unauthorized packaging—are clearly issues that are the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants.

139.    As of January 23, 2023, eleven of thirteen products listed on the "Ben Watkins" storefront were Delta products.  Moreover, on January 19, 2023, all or substantially all products listed on the "Ben Watkins" storefront were Delta products.  Thus, upon information and belief,

the foregoing product reviews reflect consumer reviews of products sold by Defendants bearing the Delta Trademarks.

140.    Delta allows its products to be sold only by Authorized Sellers, who are subject to and must follow the quality control and customer service requirements in the Delta Rules, to prevent customers who purchase Delta Products from suffering experiences like those described in the above complaints about Defendants.

**Defendants Are Infringing the Delta Trademarks by Selling Products Bearing the Delta Trademarks that Do Not Come With the Delta Warranty**

141.    As set forth above, genuine Delta Products purchased from Delta or Authorized Sellers who comply with Delta's quality controls come with the Delta warranty.

142.    Because Defendants are not Authorized Sellers of Delta Products and do not comply with Delta's quality controls, the products they sell bearing the Delta Trademarks do not come with the Delta Warranty.

143.    Because the products Defendants sell do not come with the Delta Warranty, they are materially different from genuine Delta Products.  The Delta Warranty is a material part of what consumers expect when they purchase Delta Products.

144.    Defendants' unauthorized sale of non-genuine products bearing the Delta Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Delta Products that come with the Delta Warranty when, in fact, they are not.

**Infringing Products Bearing the Delta Trademarks That Defendants Are Selling Are Being Stored All Around the United States, Including in Indiana**

145.    Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

146.    Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will: (i) itself store and ship products; or instead (ii) pay ongoing fees to have Amazon.com store the seller's products at "fulfillment centers" (*i.e.*, warehouses) operated by Amazon.com, and ship products to consumers once they have been purchased.  Amazon.com offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

147.    When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

148.    However, sellers who use the "Fulfillment By Amazon" are not able to control where Amazon.com stores sellers' products.  Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com.  These terms provide that Amazon.com can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

149.    Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state.  Amazon.com also promises to customers that all product orders it fulfills—including products that third-party sellers on Amazon sell to customers while using the "Fulfillment By Amazon" service—will be delivered within two days of purchase.  To live up to this promise, Amazon.com carefully distributes all products it stores for third-party sellers between its fulfillment centers, all around the country, to

ensure that products can be delivered within two days of purchase no matter where in the United States they are ordered from.

150.    As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com, including in Indiana, where there are more than a dozen Amazon fulfillment centers. *See* https://selleressentials.com/amazon/amazon-fulfillment-center-locations/.

151.    Defendants are using Amazon.com's Fulfillment By Amazon" service for many of the infringing products bearing the Delta Trademarks they are selling through their "Ben Watkins" Amazon storefront, as shown below (red circle for emphasis):



152.    Based on these facts, it is likely that large quantities of products bearing the Delta Trademarks owned by Defendants are being stored within Indiana before the products are purchased by residents of Indiana because Defendants have opted to fulfill their goods by Amazon.

153.    Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Delta Trademarks to consumers nationwide, including customers located in Indiana, and is paying Amazon for the privilege to do so through commissions and fees.  Defendants have not taken any steps to prevent residents of Indiana from purchasing products bearing the Delta Trademarks from Defendants' Amazon storefront.

**Delta Has Suffered Substantial Harm as a Result of Defendants' Conduct**

154.    As set forth above, the unauthorized sale of products bearing the Delta Trademarks through unauthorized sellers such as Defendants has caused significant harm to the Delta brand.

155.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Delta.  As such, Defendants' ongoing sale of non-genuine products bearing the Delta Trademarks harms the Delta brand.

156.    Delta has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

157.    Delta has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

158.    Delta is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Delta Trademarks, causing continued irreparable harm to Delta's reputation, goodwill, relationships, intellectual property, and brand integrity.

159.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

160.    Defendants' disregard of communications from Delta and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

161.    Defendants' willful violations of the Delta Trademarks and continued pattern of misconduct demonstrate intent to harm Delta.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

162.    Delta hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

163.    Delta is the owner of the Delta Trademarks.

164.    Delta has registered the Delta Trademarks with the United States Patent and Trademark Office.

165.    The Delta Trademarks are valid and subsisting trademarks in full force and effect.

166.    Defendants willfully and knowingly used, and continue to use, the Delta Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Delta Trademarks on the Internet without Delta's consent.

167.    The products Defendants sell bearing the Delta Trademarks are not authorized for sale by Delta.

168.    The products Defendants sell bearing the Delta Trademarks are materially different from genuine Delta Products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Delta has established.

169.    The products Defendants sell bearing the Delta Trademarks are also materially different from genuine Delta Products because they do not come with the Delta Warranty, which accompanies genuine Delta Products.

170.    Defendants' unauthorized sale of materially different products bearing the Delta Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Delta Products when they are not.

171.    Defendants' unauthorized sale of materially different products bearing the Delta Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Delta when, in fact, they are not.

172.    Defendants' unauthorized use of the Delta Trademarks has infringed upon and materially damaged the value of the Delta Trademarks and caused significant damage to Delta's business relationships.

173.    As a proximate result of Defendants' actions, Delta has suffered, and will continue to suffer immediate and irreparable harm.  Delta has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

174.    Delta is entitled to recover its damages caused by Defendants' infringement of the Delta Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

175.    Delta is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Delta will suffer irreparable harm.

176.    Delta is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Delta Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)**

177.    Delta hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

178.    As set forth above, Defendants are selling non-genuine products bearing the Delta Trademarks that are materially different from genuine Delta Products.

179.    Defendants' sale of non-genuine products bearing the Delta Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Delta when they are not.

180.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

181.    Delta is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Delta will suffer irreparable harm.

182.    Delta is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Delta Trademarks.

### THIRD CAUSE OF ACTION
**Common Law Trademark Infringement and Unfair Competition**

183.    Delta re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

184.    Delta owns the Delta Trademarks.

185.    Delta has registered the Delta Trademarks with the United States Patent and Trademark Office.

186.    The Delta Trademarks are valid and subsisting trademarks in full force and effect.

187.    The Delta Trademarks, including the DELTA trademark, are distinctive and widely recognized by the consuming public.  Delta Products are sold by Delta's network of Authorized Sellers throughout the United States, including in Indiana.

188.    Delta is widely recognized as the designated source of goods bearing the Delta Trademarks.

189.    Defendants willfully and knowingly used, and continue to use, the Delta Trademarks in commerce for the purpose of illegally selling products bearing the Delta Trademarks in Indiana.

190.    The products Defendants sell bearing the Delta Trademarks are not authorized for sale by Delta.

191.    Delta has established legitimate and substantial quality-control procedures over Delta Products.

192.    Delta abides by these quality control procedures and requires all Authorized Sellers to abide by them.

193.    Delta's quality controls are material, as they protect consumers and prevent consumers from receiving poor quality products or poor customer service.  When a consumer considers whether to purchase a product bearing the Delta Trademarks, whether the product is subject to and abides by Delta's quality control and customer service requirements is relevant to the consumer's purchasing decision.

194.    The products Defendants sell bearing the Delta Trademarks are not subject to, do not abide by, and interfere with Delta's quality controls and customer service requirements.

195.    Because the products Defendants sell bearing the Delta Trademarks are not subject to, do not abide by, and interfere with Delta's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Delta Products sold by Authorized Sellers.

196.    Because the products Defendants sell bearing the Delta Trademarks are materially different from Delta Products sold by Authorized Sellers, the products Defendants sell are not genuine Delta Products.

197.    Defendants' unauthorized sale of products bearing the Delta Trademarks interferes with Delta's quality controls and its ability to exercise quality control over products bearing the Delta Trademarks.

198.    Defendants' unauthorized sale of products bearing the Delta Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Delta Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, Delta's quality controls when, in fact, they do not.

199.    Defendants' unauthorized sale of products bearing the Delta Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Delta Trademarks suggests that the products Defendants offer for sale are genuine Delta Products when, in fact, they are not.

200.    Defendants' unauthorized sale of products bearing the Delta Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Delta Trademarks suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Delta when, in fact, they are not.

201.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Delta Products when, in fact, they are not.

202.    Defendants' unauthorized sale of products bearing the Delta Registered Trademarks and unauthorized use of the Delta Trademarks in advertising infringes the Delta Trademarks and constitutes unfair competition at common law.

203.    Defendants' knowing and willful use of the Delta Trademarks in connection with the unauthorized and illegal sale of products bearing the Delta Trademarks infringes on the Delta Trademarks and is contrary to honest practice in industrial and commercial matters.

204.    Defendants' unlawful actions and unauthorized use of the Delta Trademarks has infringed upon and materially damaged the value of the Delta Trademarks and has caused significant damage to Delta's business relations.

205.    As a proximate result of Defendants' actions, Delta has suffered, and continues to suffer, immediate and irreparable harm.  Delta has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor quality products and post negative reviews that will remain on Amazon permanently, harming Delta's reputation among consumers and the placement of its products in search results.

206.    Delta has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

207.    Delta is also entitled to punitive damages because Defendants acted with malice, fraud, gross negligence, or oppressiveness that was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

**FOURTH CAUSE OF ACTION**
**Indiana Crime Victim's Relief Act – Indiana Code § 35-24-3-1,**
**Deception – Indiana Code §§ 35-43-5-3(a)(4)(B), 35-43-5-3(a)(6)**

208.    Delta re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

209.    By engaging in the unlawful, knowing, intentional, deliberate, willful, and malicious actions described above, Defendants have misrepresented their identities and the quality and identity of their products.

210.    Defendants' unlawful, knowing, intentional, deliberate, willful, and malicious sales, offers for sale, and displays for sale of Delta-branded products on Amazon misrepresent the identity and quality of the products by presenting them as genuine Delta products, when, in fact, they are not.

211.    Defendants' unlawful, knowing, intentional, deliberate, willful, and malicious use of a fictitious address on the "Ben Watkins" storefront deceives customers and misrepresents the identity of the person or persons running the storefront as being based domestically in Ohio and/or Colorado, when in fact, they are not.

212.    Defendants have therefore committed deception under Indiana Code Sections 35-43-5-3(a)(4)(B), 35-43-5-3(a)(6).

213.    As a direct and proximate result of Defendants' actions described herein, Delta has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill, unless and until the Court preliminarily and permanently enjoins Defendants' actions. Delta has no adequate remedy at law with respect to those of Defendants' actions that are ongoing.

214.    As a direct and proximate result of Defendants' actions described herein, Delta has suffered, and will continue to suffer, monetary damages and pecuniary losses in amounts to be proven at trial.

215.    Under the Indiana Crime Victims' Relief Act, Indiana Code Section 35-24-3-1, a person that suffers pecuniary loss as a result of the violation of Indiana Code Sections 35-43 *et seq.*, may bring a civil action against the person who caused the loss for treble damages, costs of the action, and reasonable attorneys' fees.

216.    As set forth herein, Defendants have violated Indiana Code Section 35-43-5-3 through Defendants' knowing, intentional, deliberate, willful, and malicious commission of deception.

217.    Delta is the victim of Defendants' deception and other knowing, intentional, deliberate, willful, and malicious actions set forth herein, and, as a result, has suffered, and will continue to suffer monetary damages and pecuniary losses in amounts to be proven at trial.

218.    Delta is accordingly entitled to an award of those actual damages as well as statutory treble damages, costs, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Delta prays for relief and judgment as follows:

A.    Judgment in favor of Delta and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Delta Trademarks;

ii)      Prohibiting the Enjoined Parties from using any of the Delta Trademarks in any manner, including advertising on the Internet;

iii)      Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Delta Trademarks;

iv)      Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Delta Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Delta's products, or any of the Delta Trademarks;

vi)      Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Delta Trademarks which associate Delta's products or the Delta Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)    Requiring the Enjoined Parties to take all action to remove the Delta Trademarks from the Internet, including from the website www.amazon.com; and

viii)    Requiring the Enjoined Parties to destroy or return to Delta all products bearing the Delta Trademarks in their possession, custody, or control.

C.    An award of damages, statutory treble damages, attorneys' fees, costs, and expenses.

D.    Such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Delta demands a trial by jury on all issues so triable.

Dated: February 1, 2023        Respectfully submitted,

                              */s/ Louis T. Perry*
                              Louis T. Perry (#25736-49)
                              louis.perry@faegredrinker.com

                              **FAEGRE DRINKER BIDDLE & REATH LLP**
                              300 North Meridian St., Suite 2500
                              Indianapolis, IN 46204
                              Phone: (317) 237-0300
                              Fax: (317) 237-0000

                              *Attorney for Plaintiff, Delta Faucet Company*